**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| OMAR E. ROMERO-ACOSTA, et al.<br><br>Plaintiffs,<br><br>v.<br><br>BOTTLES, KINDRED SPIRITS, INC. and RICHARD GONSALVES<br><br>Defendants. | Civil No. 23-1163 (GLS) |

**OPINION AND ORDER**

Pending before the Court are Plaintiffs' Motion in Compliance with Order Renewing Request for Class Certification at Docket No. 222. Defendants' opposition thereto at Docket No. 234 and Plaintiffs' reply at Docket No. 259. Also pending is Plaintiffs' Motion for Summary Judgment on Liability at Docket Nos. 211, 214. Defendants' opposition at Docket Nos. 238-1 and 235-1 and Plaintiffs' reply at Docket No. 248. For the reasons discussed below, Plaintiffs' motion for class certification is **GRANTED in part** and Defendants' motion to decertify the class is **DENIED**. Plaintiffs' motion for summary judgment is **DENIED**.

## I. Factual and Procedural Background

This case was originally filed by a single Plaintiff, Omar E. Romero-Acosta, in the courts of Puerto Rico as a summary proceeding for unpaid wages against Kindred Spirits, Inc. ("KSI"). Docket No. 1-1. The case was removed to this Court on April 6, 2023. Docket No. 1. On May 25, 2024, Plaintiff Romero-Acosta moved for a conditional certification of the case as a collective class action under Section 216(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Docket No. 32. Plaintiff requested that a notification to potential opt-in plaintiffs be approved by the Court to contemplate the claims under the FLSA and the five-year statute of limitations applicable to minimum wage claims under Puerto Rico law. Id. Plaintiff also sought that Defendants produce a list of all present waiters at Bottles and former waiters who left their employment in the last five (5) years. Id. On December 20, 2024, the Court issued a Memorandum

and Order, allowing the filing of an Amended Complaint and conditionally certifying the case. Docket No. 60. The Court also allowed discovery and ordered the parties to submit a proposed notice to potential plaintiffs for the Court's approval. Id. The Court designated the law firm of Plaintiff's counsel as counsel for all plaintiffs. Id. On July 21, 2025, the Court approved the notice to be sent to potential opt-in plaintiffs. Docket No. 154-1. Pursuant to the notice, the case was conditionally certified as an FLSA collective action for claims under the FLSA and Puerto Rico law. Id. Opt-in consent forms were due by August 20, 2025. Id. Between the original plaintiffs and those that have opted-in, the collective action is currently composed of a total of twenty-four (24) plaintiffs. See Docket Nos. 170-172, 182.

The Amended Complaint was filed on January 8, 2025. Docket No. 62. The Amended Complaint was filed on behalf of five (5) additional plaintiffs (Hector Batista Figueroa, Carlos Pérez, Etienne Pomales, Aileen Rosado-Ferrer and Dianne L. Viego-Fernández) but was brought as a collective action on behalf of current and formers members of the waitstaff at the Bottles restaurant for alleged violations of the minimum wage and overtime requirements of the FLSA and Puerto Rico laws in 29 P.R. LAWS. ANN. § 250 et seq. and 29 P.R. LAWS ANN. § 175 et seq. Docket No. 62 at ¶¶ 1.1-1.2, 3.1-3.6. The Amended Complaint alleges that Bottles included in its receipts to restaurant patrons an additional charge, calculated based on a fixed percentage of food and beverage consumption, or a "service charge." Id. at ¶ 4.6. That Bottles knew that such a charge was not allowed under Puerto Rico law. Id. at ¶¶ 4.10-4.15. And that because such a "service charge" approximated the percentage typically given as a tip to servers in a restaurant (16% to 18%), Bottles customers were led to believe that such a "service charge" would be paid to Bottles servers. Id. at ¶¶ 4.16, 4.25-4.26. But that Bottles servers were instead paid on a commission basis, which has varied overtime, but amount to less (approximately half) of the entire amount of the "service charge" imposed on restaurant customers. Id. at ¶¶ 4.17-4.20. As alleged, "defendants have retained for their own benefit approximately one half of the mis-named 'service charge' and further have failed to pay the wait-staff the minimum wages required under Puerto Rico and federal law or applicable overtime pay." Id. at ¶ 4.24. Plaintiffs allege that the "service charge" was a tip is disguise. Id. at ¶ 4.30. Plaintiffs also aver that Bottles violated the law by imposing illegal fines for tardiness and asserted infractions by servers, which had the effect of further reducing the compensation owed to servers. Id. at ¶ 4.28. The Amended Complaint includes three (3) causes of action. The First Cause of Action is for restitution for all amounts owed because of Bottles' failure

to pay minimum and overtime wages, illegal retention of compensation, failure to make required disclosures and improper splitting of tips with non-eligible employees in violation of the FLSA. Id. at ¶¶ 5.2-5.4. The Second Cause of Action is for payment of underestimated and unpaid vacation leave, sick leave, and overtime. Id. at ¶¶ 6.2-6.6. And the Third Cause of Action is for attorneys' fees. Id. at ¶¶ 7.2-7.7. Plaintiffs seek liability against KSI and its President and then-owner or operator of the Bottles restaurant, Richard Gonsalves. On August 14, 2025, Defendants answered the Amended Complaint. Docket No. 165. Discovery has concluded. Plaintiffs moved for summary judgment on liability.[1]

**II. Collective Action under the FLSA**

Under Section 216 of the FLSA, an employee may initiate a cause of action against his employer to claim unpaid minimum wages, unpaid overtime, and liquidated damages. See 29 U.S.C. § 216(b). The same section provides that such an action can be maintained against an employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Id. This is what is known as an FLSA collective action. It is "a kind of mass action, in which aggrieved workers act as a collective of individual plaintiffs with individual cases, thereby capitalizing on efficiencies of scale, but without necessarily permitting a specific, named representative to control the litigation, except as the workers may separately agree." 22B Fed. Proc., L. Ed. § 52:1600 (May 2026); 1 McLaughlin on Class Actions § 2:16 (22nd ed.) ("The purpose of a collective action under the FLSA is to allow plaintiffs to minimize individual expenses in pursuing wage rights through pooled resources and to benefit the judicial system through unitary of common legal and factual issues arising from the same conduct."). There are three (3) main differences between a collective action under the FLSA and a Rule 23 class action: a collective action requires that members of the class consent to opting into the case, the *res judicata* effect of the FLSA collective action extends only to the named parties (including those that opt-in to the action), and the FLSA requires that employees be "similarly situated" to be able to proceed as a collective. 22B Fed. Proc., L. Ed. § 52:1600; 1 McLaughlin on Class Actions §

[1] Defendants have also moved for summary judgment at Docket No. 267, but that motion is pending.

2:16. One issue before the Court today is the requirement that opt-in plaintiffs be "similarly situated."

Nothing in the FLSA regulates the mechanics for the certification process before allowing a case to proceed as a collective action. But courts have applied a two-tier process for certification in FLSA cases. Pérez v. Prime Steak House Rest. Corp., 959 F. Supp. 2d 227, 230 (D.P.R. 2013); Johnson v. VCG Holding Corp., 802 F. Supp. 2d 227, 233 (D. Me. 2011) ("The general practice of district courts within the First Circuit—including this Court—has been to adopt a 'two-tiered' approach to certification of collective actions under the FLSA."); Bah v. Enter. Rent-A-Car Co. of Bos., LLC, 560 F. Supp. 3d 366, 372 (D. Mass. 2021) (same). The first step is at the pleadings stage and has been referred to as a conditional certification. Courts have used a conditional certification process to make a "lenient review" of the pleadings and "assess whether the 'proposed members of a collective are similar enough to receive notice of the pending action.'" Waters v. Day & Zimmermann NPS, Inc., 23 F.4th 84, 89 (1st Cir. 2022); Pérez, 959 F. Supp. 2d at 230 (whether the putative class members were subject to a single decision, policy or plan that violated the law). Once an action is conditionally certified, potential parties are given notice of the action. Waters, 23 F.4th at 89 ("The sole consequence of conditional certification is the sending of court-approved written notice to employees … who in turn become parties to a collective action only by filing written consent with the court."). Plaintiffs become parties to the case only after opting in. Id. (attaining full party status).

At the second stage, after completion of discovery, courts consider whether decertification of the action is appropriate. A defendant may move for decertification if the plaintiffs are not "similarly situated." Pérez, 959 F. Supp. 2d at 230. This second stage may also be triggered by plaintiffs' motion for final certification. 22B Fed. Proc., L. Ed. §§ 52:1601, 52:1605. The factors to consider at the second stage are: (1) differences in the employment settings of the individual plaintiffs; (2) defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations, such as whether allowing the case to proceed as a collective action would further the goal of the FLSA collective action provisions or whether proceeding as a collective action would be prejudicial for the defendant. Rosselló v. Avon Prods., Inc., 2015 WL 3890403, at *2-3 (D.P.R. June 24, 2015) (quoting Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)). Generally, courts have found that plaintiffs are "similarly situated" when they have similar job duties and pay provisions and complain of a

common work policy. Prescott v. Prudential Ins. Co., 729 F. Supp. 2d 357, 364 (D. Me. 2010) (citations omitted). The standard does not require that all plaintiffs stand on identical footing. LaFleur v. Dollar Tree Stores, Inc., 30 F. Supp. 3d 463, 468 (E.D. Va. 2014) ("This is not to say that there can be no differences among class members or that an individualized inquiry may not be necessary in connection with fashioning the specific relief or damages to be awarded to each class member. Rather, the inquiry is whether the presence of common issues allows the class-wide claims to be addressed, without becoming bogged down by individual differences among class members. Insubstantial differences in job duties, hours worked and wages due that do not materially affect whether a group of employees may be properly classified are not significant to the 'similarly situated' determination.") (citations omitted). Each of the factors is weighed against the purpose of Section 216(b) of the FLSA: to reduce plaintiffs' costs by allowing them to pool resources, and to have a controversy be submitted to one proceeding if it will efficiently resolve common issues of law and fact arising from the same activity. 1 McLaughlin on Class Actions § 2:16.

The Court's inquiry on the second stage of the two-tier certification process is a factual one— "a flexible inquiry into the factual differences between the party plaintiffs and the desirability of collective treatment." Campbell v. City of Los Angeles, 903 F.3d 1090, 1113 (9th Cir. 2018) (citation omitted); LaFleur, 30 F. Supp. 3d at 468; Johnson, 802 F. Supp. 2d at 234; Prescott, 729 F. Supp. 2d at 359, 364. Plaintiffs shoulder the burden at this stage. Anderson v. Cagle's Inc., 488 F.3d 945, 953 (11th Cir. 2007); 22B Fed. Proc., L. Ed. § 52:1605 ("the named plaintiffs bear the burden of showing, by a preponderance of the evidence that the opt-in plaintiffs are 'similarly situated' to them for FLSA purpose, i.e., subject to some common employer practice that, if proved would help demonstrate a violation of the FLSA."). And the burden is more stringent than the one required at the conditional certification stage. Prescott, 729 F. Supp. 2d at 359, 365 (citations omitted). Ultimately, the consequence of decertifying a collective action under the FLSA is the dismissal without prejudice of the claims of the opt-in plaintiffs; the case then proceeds with the claims asserted by the originally named plaintiffs. Campbell, 903 F.3d at 1101.

Before the Court is Plaintiffs' motion in compliance with Court order at Docket No. 222, arguing that Plaintiffs are not required to move for additional certification to proceed as a collective action under the FLSA. Plaintiffs also argue that this case is about a "uniform scheme of compensation" that applied to all servers. And that, even though there were changes in the

nomenclature used to describe the compensation structure (initially Defendants applied a service charge and later an "all-inclusive dinning" option), under both arrangements, servers' compensation was derived from a percentage of customer consumption. The issue applicable to all plaintiffs here, Plaintiffs argue, is whether the compensation structure used by Bottles was a vehicle to disguise a tipping system that ultimately violated the FLSA. Plaintiffs posit that, aside from having different dates of employment, all Plaintiffs are similarly situated, and a collective action is proper.

Defendants opposed and, alternatively, moved to decertify the conditionally certified FLSA collective action. Docket No. 234. Defendants argue that Plaintiffs are not "similarly situated." Specifically, that Plaintiffs worked at Bottles on different dates and were not subject to the same compensation structure, some worked when the service charge applied and others when there was an "all-inclusive dining" in place, and that Defendants will raise statute of limitations defenses as to no less than seven (7) of the Plaintiffs. Defendants also seek for the Court to find that Plaintiffs' claims in the Amended Complaint are limited to FLSA violations on account of the service charge structure, which ended on October 1, 2022, and do not extend to claims pertaining to servers' compensation after the "all-inclusive dining" was implemented. Defendants preemptively argue against allowing Plaintiffs to amend their complaint to seek relief related to server compensation when the "all-inclusive dining" was put in place on October 1, 2022.

To address the first factor— differences in the employment settings of the individual plaintiffs— Plaintiffs rely on the fact that there was a uniform employment policy that applied to all servers after the year 2013, independent from their dates of employment. All servers were paid based on "commissions," which were derived from a percentage of a 16-18% service charge included on the total cost of the food and beverage consumed by customers (before October 1, 2022) or from a percentage of the mark-up applied to all food prices for dine-in customers ("all-inclusive dining" after October 1, 2022). Defendants counter by arguing that Plaintiffs have not made a claim for the commission structure implemented after October 1, 2022 (the "all-inclusive dining") in the Amended Complaint. Defendants therefore contend that the opt-in plaintiffs were not all subject to a uniform employment policy because the compensation structure applicable to each plaintiff depended on their respective dates of employment.

Liberally read, Plaintiffs' Amended Complaint does include claims due to Defendants' payment structure after October 1, 2022. See Docket No. 62 at ¶¶ 4.7, 4.8, 4.16, 4.17, 4.18, 4.20,

4.34 (Bottles has paid plaintiffs primarily or solely on the basis of a "commission," but the commission is not the entire amount of the charge imposed on customers and the challenged practice at Bottles is ongoing).[2] And, critically, the issue as to all opt-in plaintiffs (regardless of their date of employment) is certainly the same: servers were paid a fraction of the service charge or the mark-up, which Defendants identify as a "commission." In Plaintiffs' view, such a service charge or markup was a tip in disguise and Defendants' failure to pay the entire amounts to the servers constituted an impermissible usurpation of servers' wages. See Butler v. DirectSAT USA, LLC, 47 F. Supp. 3d 300, 306, 311 (D. Md. 2014) ("The existence of a common policy 'may assuage concerns about plaintiffs' otherwise varied circumstances."); 1 McLaughlin on Class Actions § 2:16 (first factor requires substantial evidence of a single decision, policy or plan).

Plaintiffs have also demonstrated that class members performed similar job duties and had similar conditions of employment and supervision at Bottles. In the declarations under penalty of perjury submitted in support of their motion for summary judgment,[3] ten (10) Plaintiffs stated that they worked as servers at the Bottles' Guaynabo location. See Docket No. 214-1. Defendants do not dispute that servers at Bottles performed similar job duties. Further, in those declarations, the servers explain that the whole time they worked at Bottles, Richard Gonsalves was the owner and principal manager at Bottles, was usually on site during their shifts, and exercised direct supervision authority over their duties. Id. The servers also declared that they did not receive hourly compensation and that they were paid a "commission" derived from a percentage of either the 16-18% service charge included in the total cost of food and beverages consumed by customers or the markup applied to food prices for dine-in customers under the "all-inclusive dining" model implemented after October 1, 2022. Id. Indeed, on this last point, Plaintiffs have also presented in support of their motion for summary judgment a memorandum dated October 1, 2022, describing the all-inclusive dining structure, which was directed to "all servers" and summarized the new compensation structure as applying to all servers without distinction. See Docket No. 214-10. And Defendants have proposed as an uncontested fact that from 2017 through 2022, all servers employed at KSI were paid in the same manner. See Defendants' Statement of Additional

[2] This issue is discussed more fully below.

[3] Plaintiff incorporated by reference the evidence submitted in support of their motion for summary judgment. See Docket No. 222 at p. 6.

Uncontested Facts at Docket No. 235-1 ("DSAUF") ¶ 8; Docket No. 95, Stipulation No. 11. This constitutes additional evidence that Bottles' compensation structure was intended to apply to all servers equally. See Docket No. 214-10; see also DSAUF ¶ 56 (calculation of vacation and sick leave for all plaintiffs was the same). Defendants have not presented any evidence to contest the similarities in the duties performed by the servers, the similarities in the conditions of employment of the servers, or that they were all directly supervised by the same owner and manager, Richard Gonsalves, during their tenure at Bottles. Further, any potential differences among Plaintiffs, such as the number of hours worked or the amount of wages ultimately earned, do not preclude a finding that they are "similarly situated." See LaFleur, 30 F. Supp. 3d at 470 ("Differences as to time actually worked, wages actually due and hours involved do not preclude a finding of a 'similarly situated' class.") (citation omitted) (cleaned up). This first factor weighs in favor of certification.

Defendants claim that the second factor— defenses against the claims of individual opt-in plaintiffs— should lead the Court to decertify the action because Defendants will assert statute of limitations defenses, which will vary depending on each opt-in plaintiff's dates of employment. To be sure, decertification could be warranted if there were significant differences in the defenses to be presented against each opt-in plaintiff. But the presence of individual defenses in and of itself does not make collective action unmanageable. LaFleur, 30 F. Supp. 3d at 473. Indeed, a collective action under the FLSA can proceed on divided classes precisely to address issues of statute of limitations that may apply to some but not all plaintiffs. Id. at 474; See Butler, 47 F. Supp. 3d at 313 (citations omitted) (rejecting finding for defendant on second factor because some plaintiffs would have to prove willfulness and finding that such individual proof would not be prejudicial for employer; "Defendants will not be prejudiced by letting the collective attempt to prove willfulness for the benefit of only some of the opt-in Plaintiffs. If an individual plaintiff was proceeding on a claim that fell within the normal two-year limitations period, it would not be considered prejudicial to an employer, if for whatever reason, the employee desired to go beyond what is required by attempting to prove willfulness. Such overachieving is not prejudicial.")) (citation omitted). Without more from Defendants, this second factor also weighs in favor of certification.

Fairness and procedural considerations— the third factor— requires the Court to weigh the primary objective of allowing collective actions (lower costs to plaintiffs by pooling resources and limiting controversy to one proceeding to resolve common issues of law and fact that arose from

the same activity) *vis-à-vis* the prejudice that proceeding as a collective could pose to defendant. LaFleur, 30 F. Supp. 3d at 475. Neither party has presented arguments or evidence to aid the Court in evaluating this third factor. But there appear to be clear efficiencies in allowing this case to proceed as a collective action: Plaintiffs could continue to pool their resources, while Defendants could defend against a single action rather than against two (2) dozen individual claims. And resolving the claims in a single proceeding would also avoid the risk of inconsistent rulings on the legal issues presented in this case. See Butler, 47 F. Supp. 3d at 314 (that individual lawsuits could result in piecemeal litigation and potential inconsistent adjudications is less preferable than allowing a case to proceed collectively for plaintiffs that would use much of the same evidence and witnesses, and where common questions can be answered with common proof). Without any evidence to the contrary, the Court finds that proceeding as a collective action would not pose undue burden on Defendants as it is clear from the summary judgment submissions that all Plaintiffs will rely on the same evidence and witnesses and that the main contested issue— whether the Bottles compensation structure constituted a tip in disguise and violated the provisions of the FLSA— is common to all opt-in Plaintiffs and constitutes a sufficiently complex legal matter (see discussion below) that could, if decided by different courts, render inconsistent rulings. On this record, the third factor also weighs in favor of certification.

In sum, Plaintiffs have met the burden of demonstrating that opt-in plaintiffs are similarly situated. Any differences in employment dates, limitations defenses, or wages do not preclude collective treatment or outweigh the efficiencies of proceeding collectively with respect to the claims under the FLSA. Nevertheless, the parties have not sufficiently briefed whether Plaintiffs' claims under Puerto Rico law should also be certified under the standard applicable to FLSA collective actions or whether the Rule 23 class action standard applies to those claims. See Prescott, 729 F. Supp. 2d at 363; 1 McLaughlin on Class Actions § 2:16 (district courts may exercise supplemental jurisdiction over state law claims of putative Rule 23 class members). Accordingly, the parties are ordered to submit supplemental briefs on this issue by **October 15, 2026**. Briefs are not to exceed ten (10) pages and should address whether certification of Puerto Rico law claims is also warranted under the collective action standard of the FLSA or whether Rule 23 class action requirements apply to those claims. Accordingly, Plaintiffs' motion in compliance and for certification of the FLSA claims as a collective action at Docket No. 222 is **GRANTED in part** and Defendants' response and motion for decertification is **DENIED**.

## III. Motion for Summary Judgment

### A. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See FED. R. CIV. P. 56(a). A dispute of fact is "genuine" if "the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Dunn v. Trs. Of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal quotations and citations omitted). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the initial burden of establishing "the absence of a genuine issue of material fact." See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The non-movant must demonstrate, "through submissions of evidentiary quality, that a trial worthy issue persists." See Iverson v. City of Bos., 452 F.3d 94, 98 (1st Cir. 2006). However, when the non-movant bears the ultimate burden of proof at trial, the non-movant may not "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). Further, while the Court draws reasonable inferences from the record in the light most favorable to the non-movant, it casts aside and ignores "conclusory allegations, improbable inferences, and unsupported speculation." See García-García v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (internal quotations and citations omitted).

### B. Uncontested Facts

#### 1. Stipulations of facts are binding in summary judgment stage.

Plaintiffs argue that the pre-hearing stipulations entered in February 2025 (Docket No. 95) in connection with the request for prejudgment remedies are not binding at this juncture. Defendants oppose and rely on stipulations reached with Plaintiffs in opposing Plaintiffs' request for summary judgment. A party is bound by factual stipulations and may not unilaterally withdraw from them absent leave of court and good cause. Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 6 (1st Cir. 2007) ("[o]nce a party has entered into a stipulation … that party is not at liberty to renege unilaterally on a stipulated fact without leave of court, which ordinarily will not be granted absent a showing of good cause."). Good cause requires a legitimate reason for

withdrawal that does not unfairly prejudice the opposing party or undermine the interests of justice. Chao v. Hotel Oasis, Inc., 493 F.3d 26, 32 (1st Cir. 2007) ("One 'good reason' for setting aside a stipulation is "where it becomes evident that 'the agreement was made under a clear mistake.'") (quoting TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995)).

Plaintiffs identify no such good cause. The fact that the stipulations were made in connection with the prejudgment-remedies hearing does not allow Plaintiffs to disavow factual concessions made by counsel. Accordingly, I will consider the stipulations at Docket No. 95 in adjudicating Plaintiffs' motion for summary judgment.

**2. Plaintiffs' reliance on Puerto Rico consumer-protection provisions is misplaced.**

Plaintiffs rely on the Puerto Rico Transparency in Purchase Receipts Act, Law 209 of 2016, P.R. LAWS ANN. tit. 10 §§ 4241-4248 ("Law 209") and the Puerto Rico Department of Consumer Affairs' ("DACO") "Reglamento de Prácticas Comerciales del DACO," Regulation No. 9158, (P.R. Dep't of Consumer Affairs Feb. 6, 2020), as purported support for their contention that Defendants violated federal minimum-wage requirements.

The classification of a service charge for purposes of the FLSA is governed by federal law and the FLSA's implementing regulations. Indeed, Puerto Rico law expressly incorporates federal standards governing minimum wage, compensable working hours, and exemptions. See P.R. LAWS ANN. tit. 29, § 262a (providing that federal laws and regulations concerning those matters shall be recognized in applying Puerto Rico's minimum-wage law). The First Circuit has likewise held that the FLSA provides the exclusive remedy for rights created under the Act. Román v. Maietta Constr., Inc., 147 F.3d 71, 76 (1st Cir. 1998) (citation omitted). Law 209 and DACO Regulation No. 9158 serve a different purpose. These are consumer-protection measures directed primarily at promoting transparency and legal certainty in commercial transactions and regulating consumer disclosures, pricing, and deceptive commercial practices. These do not regulate the employer-employee relationship or establish the substantive standards governing minimum-wage liability under either the FLSA or Puerto Rico's minimum-wage law. Nor do these establish the standards for determining whether a payment constitutes a "tip" or "service charge" for purposes of wage law. Plaintiffs identify no authority that could lead the Court to hold otherwise. Accordingly, even assuming Defendants violated either provision, such a violation would not, by itself, establish that the service charge or markup implemented by Bottles constituted a "tip" under

the FLSA or otherwise impact the standards applicable to Plaintiffs' minimum-wage claims under Puerto Rico law.

Plaintiffs therefore cannot rely on Law 209 or DACO Regulation No. 9158 as an independent basis for establishing that the mandatory service charge or markup constituted a "tip" under the FLSA or for altering the applicable standards under Puerto Rico's minimum-wage law. Accordingly, I decline to consider Plaintiffs' Statement of Uncontested Material Facts at Docket No. 211-1 ("PSUF") ¶¶ 3.1-3.5 for purposes of a liability determination in this case.

**3. Allegations and factual findings made before DACO are not undisputed facts.**

Plaintiffs also rely on the proceedings initiated by DACO before the Puerto Rico Court of First Instance in SJ2025CV00957. Although Plaintiffs do not formally ask the Court to take judicial notice of those proceedings, they submit the DACO proceedings as part of their uncontested facts for the Court to consider in resolving this request for summary judgment. See PSUF ¶¶ 4.1-4.25. Plaintiffs claim that the DACO proceedings are relevant to the legality of KSI's service charge compensation structure. Defendants, however, argue that the factual determinations made in the DACO proceedings are neither undisputed nor properly before the Court.

Rule 201 of the Federal Rules of Evidence provides that the Court may take judicial notice of a fact that is not subject to reasonable dispute if it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Rule 201(b) regulates when a court may take judicial notice of an adjudicative fact as a shortcut to presenting evidence. Getty Petroleum Mktg., Inc. v. Cap. Terminal Co., 391 F.3d 312, 321 (1st Cir. 2004) (Lipez, concurring) ("Judicial notice of fact is an evidentiary shortcut."). But "[i]t is a fundamental principle of our jurisprudence that a factfinder may not consider extra-record evidence concerning disputed adjudicative facts." Lussier v. Runyon, 50 F.3d 1103, 1113-14 (1st Cir. 1995) ("As Rule 201(b) teaches, judges may not defenestrate established evidentiary processes, thereby rendering inoperative the standard mechanisms of proof and scrutiny, if the evidence in question is at all vulnerable to reasonable dispute.").

To be sure, courts may take notice of judicial records. Id. at n. 14 (citing 21 Wright & Graham, Federal Practice and Procedure § 5106 at 256-57 (Supp.1994)). "A court can take judicial notice that court filings contained certain allegations, or that findings of fact were made by another

court. But the truth of these allegations and findings are not proper subject of judicial notice." 1 S.A. Saltzburg, M.M. Martin & D.J. Capra, Federal Rules of Evidence Manual § 201.02[3] (12th ed. 2019). When offered for the truth of the matter asserted in the statements or allegations contained in a judicial record, judicial notice is improper as this would constitute an impermissible reliance on hearsay. 21B Wright & Graham at § 5106.4. And evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered in summary judgment. Vázquez v. López-Rosario, 134 F.3d 28, 33 (1st Cir. 1998); Dávila v. Corp. De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007); Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012).

The Court may take judicial notice that DACO filed a petition before the Puerto Rico Court of First Instance in SJ2025CV00957 to enforce the DACO resolution imposing an administrative fine against KSI. The Court may also take judicial notice that the Puerto Rico Court of First Instance issued a judgment granting DACO's petition, affirming the fine imposed by DACO, and ordering the payment of attorneys' fees. But Plaintiffs seek more. They ask the Court to treat DACO's factual determinations as uncontested and to rely on those determinations to establish that Defendants' compensation system, whether under the "service charge" regime or under "all-inclusive dining," is a tip in disguise. Plaintiffs further ask the Court to treat DACO's continued efforts to fine Bottles for its practices as evidence of the elements of willfulness under the FLSA.

This is precisely the type of use of a judicial record that Rule 201 disallows. Whether Defendants' "service charge" or "all-inclusive dining" markup constitutes a tip in disguise is in controversy. The fact that DACO previously made findings concerning that issue does not transform those findings into facts beyond reasonable dispute in this proceeding. See e.g., Prescott v. Higgins, 538 F.3d 32, 41 (1st Cir. 2008) (explaining that the facts subject to judicial notice were those at issue in the other case and not matters beyond reasonable controversy); Guzmán-Ruiz v. Hernández-Colón, 406 F.3d 31, 36 (1st Cir. 2005) (holding that plaintiffs could not sidestep their failure to offer evidence by asking the court to rule on the basis of the record in another case and finding refusal to take judicial notice justified). DACO's factual determinations are out-of-court statements offered by Plaintiffs for the truth of the matters asserted and therefore constitute hearsay. I consider only the existence and procedural history of the DACO proceedings— not the truth of the factual allegations or determinations contained therein— in resolving the present request for summary judgment.

**4. The "all-inclusive dining" structure implemented on October 2022 falls within the scope of the Amended Complaint.**

Defendants argue that Plaintiffs' statements at PSUF ¶¶ 5.1 through 5.11 regarding the all-inclusive pricing system implemented in October 2022 are immaterial because the "central issue in the Amended Complaint is a compensation system 'deriving from part of an automatic fee imposed on consumers,' which is then defined and generally referred to as a "service charge." Docket No. 235-1 at pp. 20-21. I disagree. Although the Amended Complaint frequently uses the term "service charge," the allegations are not limited to that label. Rather, Plaintiffs challenge the broader compensation system pursuant to which Bottles waitstaff received compensation derived from a percentage-based charge imposed on customers and allegedly shared with Defendants or other non-waitstaff employees. See Docket No. 62 ¶¶ 1.3, 1.5-1.7, 4.6. The Amended Complaint expressly describes the challenged charge functionally— as an "automatic fee" calculated as a percentage of food and beverage consumption— rather than limiting the claim to a charge appearing on the bill under the words "service charge." Id. ¶ 1.3. The allegations therefore can reasonably be read to encompass Plaintiffs' contention that Defendants merely changed the way the percentage-based charge was presented to customers after October 2022. Whether the post-October 2022 "all-inclusive dining" constituted a continuation of the challenged compensation scheme, rather than a genuinely different system, is a factual question going to the merits of Plaintiffs' claims. Plaintiffs were not required to plead the terminology used by Defendants to describe that compensation system. Accordingly, those facts fall within the scope of the compensation scheme challenged in the Amended Complaint. I therefore consider Plaintiffs' facts of the "all-inclusive dining" system implemented by Bottles on October 1, 2022.

**5. Plaintiffs' lengthy and duplicative submission at Docket No. 248-1 at pp. 1-90 exceeded the scope of Local Rule 56.**

Plaintiffs presented their motion for summary judgment on liability at Docket No. 211. With their submission, Plaintiffs submitted their statement of uncontested facts at Docket No. 211-1, which consisted of facts numbered 1.1 through 9.6. With their opposition, Defendants submitted their response to each of those facts set forth by Plaintiffs and additional facts numbered 1 through 53. In reply, Plaintiffs submitted a plethora of arguments and objections to Defendants' responses to their proposed facts 1.1 to 9.6 (see Docket No. 248-1 at pp. 1-90) and responses to each of the additional facts (1 through 53) proposed by Defendants (see Docket No. 248-1 at pp. 92-101).

Pursuant to Local Rule 56(b), "[a] motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." A party opposing summary judgment, should then "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Rule 56(c). And the party may also submit "additional facts, set forth in separate numbered paragraphs and supported by a record citation." Id. If additional facts are proposed by the non-movant, then the movant "shall submit with its reply a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party. "The reply statement shall admit, deny or qualify those additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts." Local Rule 56(d). Both parties had an opportunity to propose undisputed facts and to respond to the proposals for each side. However, Plaintiffs' lengthy and duplicative submission at Docket No. 248-1 at pp. 1-90, which was neither short nor concise, exceeded the scope of Local Rule 56 and will not be considered by Court.

After examining the parties' submissions but having disregarded any legal arguments, conclusory statements or unsupported facts in the parties' statements[4], the Court finds that the following material facts are not in dispute.

1. KSI is a corporation established under the Corporations Act of the Commonwealth of Puerto Rico, capable of suing and being sued. PSUF ¶ 1.1.

2. Bottles opened in 1998. PSUF ¶ 1.4; Docket No. 214-2 at p. 6.

3. Before the sale of the Bottles restaurant, Bottles was a DBA of KSI. PSUF ¶ 1.2.

4. Bottles is a restaurant, located in the San Patricio area of Guaynabo, Puerto Rico. PSUF ¶ 1.3.

5. Bottles' business concept was not that of a traditional restaurant serving each person an entrée. Its dishes are "family sized" portions, which are

[4] See Cotto-Vázquez v. United States, 2021 WL 965825 at, *28 n.7 (D.P.R. Mar. 11, 2021) (quoting Cruz-Acevedo v. Toledo-Dávila, 660 F.Supp.2d 205, 209 (D.P.R. Sept. 30, 2009) ("[a]s a general principle, parties may not include legal arguments or conclusions in their statement of facts.")).

regularly shared by anywhere between two (2) to four (4) people. DSAUF ¶ 13; Docket No. 235-5 at p. 2.

6. Richard Gonsalves was the owner and registered agent of KSI. PSUF ¶ 1.7.

7. Richard Gonsalves was a hands-on administrator. PSUF ¶ 1.8; Docket No. 214-1 at pp. 1, 7, 8, 12, 18, 20, 22, 29.

8. Julie Worley handled accounting issues for the company, bookkeeping and preparing the financial statements, as well as payroll processing. PSUF ¶ 1.9.

9. Julie Worley is currently the Secretary and Treasurer of KSI. As an officer of KSI, she did strategic planning for the corporation. PSUF ¶ 1.10.

10. Julie Worley and Richard Gonsalves are the only two officers and directors of KSI and Bottles. PSUF ¶ 1.12.

11. Bottles has both take-out service and in-dining service. PSUF ¶ 1.15; Docket No. 214-1 at pp. 6, 8, 11, 20, 22, 28.

12. In the early years of Bottles, the restaurant used a tipping system for compensating its servers. PSUF ¶ 2.1.

13. Prior to 2013, Bottles compensated its servers by paying them an hourly wage and allowing them to collect tips from customers. DSAUF ¶ 14.

14. This system resulted in a substantial disparity in compensation between servers and other employees. As the servers' compensation consisted largely of tips, employees compensated exclusively through hourly wages earned considerably less than the servers. DSAUF ¶ 15.

15. KSI began exploring the possibility of somehow ensuring a more equitable distribution between servers' and other employees' pay. DSAUF ¶ 16.

16. KSI quickly realized that raising prices to compensate for these employees was not a solution; instead, it worsened this disparity. Customers' tips are based on a percentage of the total amount in their ticket. Therefore, a price increase would necessarily result in greater tips for a server. DSAUF ¶ 17; Docket No. 235-5 ¶ 10.

17. After studying different alternatives, KSI chose to apply a service charge to dine-in customers (table service), which would then become part of KSI's revenues. DSAUF ¶ 18; Docket No. 235-5 ¶ 11.

18. In 2013, Bottles instituted a service charge to be paid by dine-in customers. PSUF ¶ 2.3.

19. Before October 2022, KSI assessed a compulsory service charge on every dine-in bill based on a percentage determined by KSI. DSAUF ¶¶ 7, 10; Docket No. 95, Stipulation No. 9.

20. In 2013, Bottles changed the compensation system to pay servers under a commission-based pay system. PSUF ¶ 2.4.

21. In its presentation to the Puerto Rico Legislature, Bottles stated that once the service charge was instituted there was no need "for customers to pay for service with a gratuity." PSUF ¶ 2.5; Docket No. 214-2 at p. 10.

22. In 2013, Bottles removed the tip line from its guest check. PSUF ¶ 2.7; Docket No. 214-2 at p. 17.

23. In its presentation to the Puerto Rico Legislature, Bottles claimed that the reason for the change was to be more equitable with compensation to "kitchen personnel." Bottles explained that the "gap between compensation to servers and compensation to kitchen personnel widened to a point where servers were earning six times that of a line chef." PSUF ¶ 2.8; Docket No. 214-2 at p. 10.

24. The initial service charge was 17% of food and beverage consumption. PSUF ¶ 2.10. Docket No. 148 at pp. 39-41.

25. In its presentation to the Puerto Rico Legislature, Bottles stated that it used "the service charge to pay our servers a commission on their sales, to pay our chefs, dishwashers and front-end personnel well above the federal minimum, and to pay almost all of our employees an attendance bonus." PSUF ¶ 2.13; Docket No. 214-2 at p. 10.

26. In its presentation to the Puerto Rico Legislature, Bottles admitted that its compensation system was set up to free "management from restrictions imposed by federal law." PSUF ¶ 2.16; Docket No. 214-2 at p. 10.

27. In tandem with the service charge system, KSI would also pay "commissions" from the sales of food and beverage for each table they served. DSAUF ¶ 19.

28. When KSI transitioned to a service charge system, the employees who worked before the change continued receiving an hourly wage in addition to commissions. These servers included Plaintiffs Felix de Jesús and Carlos Pérez. DSAUF ¶¶ 9, 22; Docket No. 235-5 ¶ 15; Docket No. 95, Stipulation No. 12

29. Although KSI did receive complaints from customers who did not want to pay the service charge, Richard Gonsalves informed the customer that the service charge was compulsory and had to be paid. DSAUF ¶ 23; Docket No. 235-5 ¶ 16.

30. To the best of Richard Gonsalves' knowledge, the service charge was never eliminated from any customer's ticket. DSAUF ¶ 24; Docket No. 235-5 ¶ 17.

31. No server, supervisor, manager, cashier, or any other employee had the authority to eliminate or change the service charge. DSAUF ¶ 25; Docket No. 235-5 ¶ 18.

32. Since KSI considered service charge revenue to the business, this increased revenue resulted in higher State Insurance Fund premiums. It also resulted in higher taxes (the "patente municipal"). DSAUF ¶ 26.

33. The service charge also resulted in other labor costs for KSI. For example, since KSI was paying servers commissions, their vacation and sick leave pay would have to be paid at a higher hourly wage than at the minimum wage. Furthermore, because all of these commissions were reported, they also resulted in higher federal payroll taxes (e.g. Social Security and Medicare). DSAUF ¶ 27.

34. KSI did not charge service charges on take-out orders, because take-out involves no service. A cashier takes the order, receives the food from the kitchen, and hands it over to the customer. The cashier provides no table service whatsoever and take-out customers do not eat their food on-site. DSAUF ¶ 31.

35. Servers never had any involvement with take-out orders. DSAUF ¶ 32.

36. When the service charge was 17%, Bottles had a sign at the restaurant with the following language: "A 17% service charge is added to all dine-in guest checks." PSUF ¶ 6.2.

37. The service charge went up to 18% when Bottles hired a sommelier sometime on or about the start of the COVID-19 pandemic. PSUF ¶ 7.1(a); Docket No. 148 at p. 222.

38. Prior to October 1, 2022, when the 18% service charge was in effect, a sign at the Bottles restaurant stated as follows: "All goods provided by Bottles are available for take-out for the prices posted either on our menu, or on the goods themselves. Should you require to consume these goods on site, you must consent to a **charge for dine-in services equal to 18%** of the price of

the goods consumed. Requesting a table, ordering goods for consumption on site, and/or consuming goods onsite constitutes **consent** to the 18% charge for dine-in service. Dine-in service offered includes consumption onsite, service by a waiter and/or other service personnel, and payment after service is complete." PSUF ¶¶ 6.3-6.4; DSAUF ¶¶ 11-12.

39. Customers were informed via signs posted on the door, on the hostess station, on the menu, and on the bill that a compulsory service charge would be added to their totals. At all times, the signs included the percentage of the service charge then in effect. DSAUF ¶ 43; Docket No. 235-5 ¶ 5.

40. Tipping at Bottles was allowed prior to October 1, 2022. PSUF ¶ 7.1(b). Docket No. 148 at p. 223.

41. There was never a week in which Plaintiff Omar Romero received less than minimum wage. DSAUF ¶ 1; Docket No. 245-1 at p. 4.

42. Omar Romero is conscious of the fact that he never received less than minimum wage. DSAUF ¶ 2; Docket No. 245-1 at p. 4.

43. Omar Romero always received the agreed-upon percentage of commissions. DSAUF ¶ 3.[5]

44. Omar Romero knew that, while the service charge was in place, there was a sign upon entering the restaurant letting everyone know that they would be charged a service charge. DSAUF ¶ 4; Docket No. 245-1 at pp. 2-3.

45. The sign also said the percentage that would be charged. DSAUF ¶ 5; Docket No. 245-1 at p. 5.

46. Omar Romero also knew that the charge was compulsorily added to customers' tickets, that the client had to pay the service charge, and that there was no way for the client to decide to pay anything else. DSAUF ¶ 6.; Docket No. 245-1 at p. 3.

47. At least since 2017 and until September 30, 2022, all servers employed by KSI were paid commissions based on a percentage of 11% their net sales after the first $181.82 in sales per shift, or the statutory minimum wage, whichever is greater. DSAUF ¶ 8; Docket No. 95, Stipulation No. 11.

48. The compulsory service charge was in effect up to and including September 30, 2022. DSAUF ¶ 42; Docket No. 235-6 ¶ 4.

---

[5] Although Defendants did not submit evidence to sustain this fact, Plaintiffs have admitted the fact conditioned on Defendants supplementing the record. Docket No. 248-1 at p. 92.

49. Each month, KSI filed a tax return with the Puerto Rico Department of the Treasury, reporting all sales from the preceding month. These taxable sales included the compulsory service charge, which was subject to Puerto Rico's sales and use tax ("IVU" in Spanish). DSAUF ¶ 44; Docket No. 235-6 ¶ 6.

50. Therefore, every single month during which the compulsory service charge was in effect, KSI reported these amounts as sales, charged IVU on each such charge, and remitted these amounts to the Puerto Rico Department of the Treasury. DSAUF ¶ 45; Docket No. 235-6 ¶ 7.

51. The proceeds from the compulsory service charge would go into KSI's operating account, along with all other business proceeds. DSAUF ¶ 46; Docket No. 235-6 ¶ 8.

52. All business expenses would be paid from this operating account, including employee wages. DSAUF ¶ 47; Docket No. 235-6 ¶ 9.

53. KSI informed Plaintiffs that their pay would be the greater of the statutory minimum wage or commissions based on their net sales. DSAUF ¶ 48; Docket No. 235-6 ¶ 10.

54. When a server received commissions, these would be reported as such in KSI's payment records. DSAUF ¶ 49; Docket No. 235-6 ¶ 11.

55. The calculation of vacation and sick leave for all Plaintiffs took into account all compensation received for hours worked, including commissions. To determine the applicable hourly rate, the total compensation for hours worked over the course of the year was divided by the total number of hours worked. DSAUF ¶ 50; Docket No. 235-6 ¶ 12.

56. On October 1, 2022, KSI delivered two memos to the servers setting forth a new policy on compensation. PSUF ¶ 5.1; Docket No. 214-10.

57. The new dine-in pricing included an 18% increase in the price of food and beverages. PSUF ¶ 5.3; Docket No. 214-10.

58. The formerly applied 18% service charge would be eliminated. PSUF ¶ 5.4; Docket No. 214-10.

59. As of October 1, 2022, the servers would be paid a lower percentage of commission over the overall price because the cost of food and beverage for the in-dining customers would be higher. PSUF ¶ 5.7; Docket No. 214-10.

60. Although the prices for food and beverages were increasing, there would not be an increase in the commission paid to the servers. PSUF ¶ 5.9.

61. The explanatory memo provided by Bottles included a chart which purported to show the "old way" versus the "new way" for compensating servers, now called "all-inclusive pricing." PSUF ¶ 5.10; Docket No. 214-10.

62. When "all-inclusive pricing" began on October 1, 2022, a sign was put up which said no tipping was allowed. PSUF ¶¶ 6.5, 7.1(c); Docket No. 148 at p. 222.

63. After about a year following the start of the "all-inclusive pricing," tipping was allowed again. PSUF ¶ 7.1(d); Docket No. 148 at p. 223.

64. Julie Worley testified that Bottles did not want the customers to be confused because, before "when there was a service charge on the bill, the customer was very clear when they would look at the total and see a service charge, they were very clear that they were being charged for service and paying service." PSUF ¶ 7.2; Docket No. 148 at pp. 222-223.

65. Julie Worley explained subsequent changes (first prohibiting tips during the initial "all-inclusive dining" period and thereafter allowing them), "we did it until we were certain that the consumers were understanding of what an all-inclusive system meant." "Then after a period of time when Richard [Gonsalves] […] was comfortable that the customers were fully aware that they were already paying for all of the expenses in the price of the food and the beverage and it was not necessary to leave a tip, [ ] he could remove the restriction." PSUF ¶ 7.3; Docket No. 148 at p. 223.

66. As of October 1, 2022, servers did not receive a commission out of the initial portion of the sales on each shift. When the commission was 9.32% of sales, the servers were paid 9.32% of the sales after the first $160.95. PSUF ¶¶ 8.1-8.2.

67. Bartenders did not receive direct hourly compensation. They were paid from the 21% service charge which was added to the bill. Although tips were formally prohibited, some customers wanted to leave a cash tip. The bartenders were required to place the extra money in a jar kept in the bar and monitored by management and surveillance cameras. Those tips accumulated and could be as high as $60.00 daily. Even if customers expressly stated that the cash tip was for the bartender, such a tip was not given to the bartenders. PSUF ¶ 7.4.

68. Tipping was prohibited at the bar. Instead, bar servers and bartenders participated in a pooled commission system, under which they earned a share of total bar sales for a given day or week, allocated in proportion to the total hours each individual worked. DSAUF ¶ 35.

69. Bar customers were informed that tipping was prohibited. DSAUF ¶ 36.

70. Receipts issued at the bar did not include a designated line for leaving a tip. DSAUF ¶ 37.

71. All employees assigned to work in the bar area were required to sign a written acknowledgment and consent to this policy as a condition of their assignment. DSAUF ¶ 38.

72. In the year 2024, an average check at Bottles was approximately $200.00. PSUF ¶ 1.13; Docket No. 148 at p. 207.

73. Plaintiffs' average hourly compensation exceeded $28.00 per hour. DSAUF ¶ 52; Docket No. 235-6 ¶ 14.

**B. Discussion**

Plaintiff's primary claim rests on 29 U.S.C. § 203(m)(2)(B), which provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." Id. The statute defines a "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). Department of Labor regulations define a "tip" as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 U.S.C. § 531.52. Critically, "[w]hether a tip is to be given, and its amount, are matters determined solely by the customer." Id. In turn, 29 U.S.C. § 531.55(a) provides that "[a] compulsory charge for service, such as 15 percent of the amount of the bill imposed on a customer by an employer's establishment, is not a tip."

In their request for summary judgment, Plaintiffs posit that the service charge and the mark up on food after October 2022 should be deemed tips in disguise. The relevant inquiry under Sections 531.52 and 531.55 is whether the customer had discretion to determine whether to pay the charge and, if so, how much to pay. Plaintiffs rely on declarations of several servers who worked at Bottles to establish that, on occasions, the service charge was subject to waiver by management. But the record contains no specific evidence to establish that Defendants actually or regularly waived the charge. And general testimony that management may have had authority to remove the charge is insufficient to establish that the charge was not mandatory and had the

element of voluntariness required for a tip. See Section 30d17 of the Department of Labor Field Operations Handbook, *Field Operations Handbook*, Dep't of Labor (Nov. 17, 2016).[6]

To be sure, there is no on-point First Circuit precedent on this issue and the only case that the Court has identified in this District, Cachola-Bonilla v. Wyndham El Conquistador Resort & Country Club, 577 F. Supp. 2d 566 (D.P.R. 2008), declined to grant summary judgment on whether the charge imposed on customers constituted a tip when there were factual disputes as to whether servers and managers could waive the service charge. Id. at 574. But the uncontested facts in this case point to the contrary conclusion— there appears to be no dispute that the service charge or markup imposed by Bottles was not subject to waiver by management and much less waiver by servers. KSI automatically imposed the service charge on dine-in bills (DSAUF ¶¶ 7, 10); KSI set the applicable percentage (PSUF ¶ 2.10, DSAUF ¶ 5); signs posted on Bottles' door, hostess station, menus, and bills informed customers that the charge would be imposed (DSAUF ¶¶ 4-5, 11-12, 43; PSUF ¶¶ 6.2-6.4); and no server, supervisor, manager, cashier, or other employee had authority to modify it (DSAUF ¶ 25). In fact, Plaintiff Omar Pérez testified that he understood that customers were required to pay the charge. DSAUF ¶ 6. And the evidence on record pertaining to the markup on food for "all-inclusive dining" after October 2022 also appears to support the conclusion that no waivers could have occurred as any waiver would have required changing the price of food to that applicable to take out orders and there is simply no evidence to sustain that a modification of dine-in prices ever occurred. See PSUF ¶¶ 5.1, 5.3 and Docket No. 214-10.

Moreover, two recent cases from other circuits provide persuasive authority that even actual, occasional waivers by management would not necessarily negate the mandatory character of the charge. In the case of Compere v. Nusret Miami, LLC, 28 F.4th 1180, 1181 (11th Cir. 2022), a group of tipped employees challenged an 18% service charge, arguing that it was actually a tip and therefore could not be used to satisfy the restaurant's wage obligations under the FLSA. The employees further argued that the service charge was not mandatory because managers had discretion to remove it from bills of dissatisfied customers. Id. at 1188. The Eleventh Circuit

[6] Section 30d17 of the DOL Field Operations Handbook provides, "[t]here must be evidence of actual discretion over the fact of and amount of the payment in order for the amount to be considered a tip and not a service charge. Such evidence may take any form, including a notation on an invoice, a 'chit', a signature on a bill, an email, telephone message, or other notation reflecting directions to adjust the amount of the payment as appropriate." See *Field Operations Handbook*, Dep't of Labor (Nov. 17, 2016), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch30.pdf.

rejected that argument and held that the service charge was not a tip and could lawfully be used to satisfy the restaurant's wage obligations under the FLSA. Id. at 1186. The Court in Compere considered that managers had discretion to remove the charge from a customer's bill when the customer complained about the food or service. Nevertheless, it found no evidence that customers had the same discretion to negotiate or remove the charge. The Court relied on 29 C.F.R. § 531.55, which provides that "[a] compulsory charge for service such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip." And deemed it "irrelevant that *managers* would sometimes remove the service charge for dissatisfied customers." Compere, 28 F.4th at 1188 (emphasis in original). As explained in Compere, "the relevant question is whether the decision to pay the given sum is 'determined solely by the *customer*.'" Id. (emphasis in original).

In Wai Man Tom v. Hospitality Ventures LLC, the Fourth Circuit considered whether customers exercised the required discretion over a 20% automatic gratuity generally applied to parties of six or more. 980 F.3d 1027, 1038 (4th Cir. 2020). The employees received compensation from hourly wages, cash and credit-card tips, and automatic gratuities. Id. at 1035. The employees argued that the automatic gratuities were tips because customers and servers occasionally asked management to remove them from the bill. Id. at 1037. Citing 29 C.F.R. § 531.52, the Fourth Circuit held that a gratuity is a tip only when both the decision to pay and the amount are "determined solely by the customer." Because the restaurant— not the customer— controlled whether to waive or modify the charge, occasional waivers did not make the gratuity a tip. Id. at 1038. The Court in Wai Man Tom distinguished cases involving charges that customers could negotiate or decline, noting that the result might differ if the charges were merely "suggested." Id. The main difference between the decisions of the Eleventh Circuit in Compere and Fourth Circuit in Wai Man Tom is that the Fourth Circuit requires that the proceeds of a mandatory service charge be included in the gross receipts of the establishment (see Smedley v. Citron LLC, 2023 WL 6119732, *7 (D. Md. Sept. 13, 2023)), an issue which is not in dispute here. DSAUF ¶¶ 44-46. But the decisions in both Compere and Wai Man Tom undoubtedly support the proposition that management's occasional exercise of discretion to waive a service charge does not transform an otherwise compulsory charge into a tip.

Plaintiffs' reliance on Luiken v. Domino's Pizza, LLC, 705 F.3d 370 (8th Cir. 2013) and Samiento v. World Yacht Inc., 883 N.E.2d 990 (N.Y. 2008) is misplaced. Luiken involved

mandatory delivery charges under the Minnesota Fair Labor Standards Act. The Minnesota statute expressly defines gratuity to include an obligatory charge that a customer might reasonably construe as payment for an employee's personal services, making the context in which the charge was presented relevant to the analysis. Id. at 372-73, 375-76. The Eighth Circuit therefore considered whether customers might reasonably understand Domino's $1–$1.50 delivery charge as a payment to the driver, even though drivers received none of the charge. The New York law at issue in Samiento prohibits an employer from retaining not only an employee's gratuity but also "any charge purported to be a gratuity for an employee." 883 N.E.2d at 993. The New York Court of Appeals therefore held that a mandatory, non-negotiable service charge could constitute a gratuity where it was represented to customers as compensation for the waitstaff in lieu of gratuity. Id. at 994. Both Luiken and Samiento turned on statutory language that is absent from the FLSA. Under the FLSA, the relevant inquiry is whether the customer has discretion to pay the charge and the amount of the payment. Neither case's analysis, which relied on state statutory interpretation, governs the FLSA inquiry here. While Plaintiffs correctly note that Congress intended other wage laws to coexist with the FLSA, Puerto Rico wage law does not define "tip" like the Minnesota and New York statutes. See P.R. LAWS ANN. tit. 29, § 262 et seq. And, as discussed above, Plaintiffs cannot rely on Law 209— a consumer-protection statute that does not regulate wages— to fill that statutory gap. Whether Defendants' conduct violates Puerto Rico's consumer-protection laws has no bearing on whether the service charge or markup at issue constitute gratuities under federal or Puerto Rico wage law. That question, in the absence of an applicable Puerto Rico statutory definition, is governed by the FLSA.

Plaintiffs refer to the fact that no service charge or markup was imposed on take-out orders to characterize the Bottles service charge or markup as non-mandatory. Defendants argue that Plaintiffs cannot rely on the absence of a service charge for take-out orders because servers were not involved in those transactions. I agree. Take-out customers receive a different service, and there is no dispute that the waitstaff at Bottles did not participate in providing such a service. See DSAUF ¶¶ 31-32. The absence of a service charge for take-out orders therefore does not establish that Bottles dine-in customers had discretion on whether to pay, or how much to pay, for the charge.

Plaintiffs' request for summary judgment on liability must be denied. Nonetheless, the foregoing discussion leads to the following question. If the main controversy in this case is whether

the Bottles service charge and markup were mandatory, and any waiver by management or differences between take-out and dine-in policies are irrelevant to that inquiry, what, if anything, remains left for a jury to decide? In my view, the answer turns on two potentially relevant issues: (1) Bottles' decision to at times prohibit customers from leaving additional gratuity to waitstaff, and (2) Bottles' stated intention for the implementation and use of the service charge or the "all-inclusive dining" markup. The decisions in Compere and Wai Man Tom, as well as all other decisions I have found involving facts like those presented here, do not address these issues. In each of these cases, the employer permitted customers to leave an additional gratuity beyond the mandatory service charge. See also Rosell v. VMSB, LLC, No. 23-12658, 2024 WL 1617821, at *2-3 (11th Cir. Apr. 15, 2024) (allowed a line for customer to include a discretionary tip separately from the compulsory charge in the final check and 100% of any gratuity paid by a customer was kept by the employee who served that guest); Petersen v. Ink 477, LLC, 2025 WL 1040819, at *2 (S.D. Fla. Apr. 8, 2025), reconsideration denied sub nom. Peterson v. INK 477, LLC, 2026 WL 1460823 (S.D. Fla. Mar. 13, 2026) (employee was paid a combination of "hourly wages, tips, and service charges"); Volpe v. VMSB LLC, 2025 WL 947508, *2 (S.D. Fl., March 28, 2025) (discretionary gratuities were a third component of plaintiffs' salary); Nelson v. MLB Hotel Manager, LLC, MLB, 2022 WL 2733720, at *1 (11th Cir., July 13, 2022) (plaintiffs allowed to receive discretionary tips in addition to any portion of the service charge). See also Houtz v. Paxos Restaurants, 2024 WL 4336738, at *4 (E.D. Pa. Sept. 27, 2024) (service charge was 20% but customers could go over the automatic charge).[7]

Whether a mandatory charge may constitute a "tip in disguise" when customers are not consistently permitted to provide any additional gratuity and are affirmatively told— or led to

---

[7] During portions of the relevant period, Bottles' customers were not presented with the ordinary choice contemplated by Cachola and Compere: a compulsory service charge accompanied by the option to leave an additional, voluntary gratuity. Cachola, 577 F. Supp. 2d at 574; Compere, 28 F.4th at 1182. The uncontested facts demonstrate that customers' ability to provide an additional gratuity— and their understanding of whether they were expected or permitted to do so— was inconsistent throughout the relevant period at Bottles. For instance, when KSI instituted the service-charge system in 2013, it removed the tip line from the guest check. PSUF ¶ 2.7. But Julie Worley testified that tipping was allowed during that period. PSUF ¶ 7.1(b); also see Docket No. 235-3 at pp. 110-112. In October 2022, when KSI eliminated the separate service-charge line by incorporating the charge into the prices of food and beverages, it initially prohibited tipping. PSUF ¶¶ 6.5, 7.1(c). Approximately one year later, KSI permitted tipping again. PSUF ¶ 7.1(d). The record also contains evidence that customers asked servers whether they could leave an additional tip and that servers were uncertain how to respond. PSUF ¶ 9.5.

understand— that the mandatory charge itself constitutes the gratuity may be relevant to the inquiry. That question may warrant consideration where, as here, the amount of the charge equates that typically attributed to a tip (between 17%-18%). PSUF ¶¶ 2.10, 5.3, 7.1(a). Further, the decisions in Compere and Wai Man Tom do not address other potentially relevant circumstances presented here, including inconsistencies in Bottles' stated intention for adopting the mandatory charge and implementing the markup[8] and use of the charge by management.[9] These questions may be significant given that this is a matter of first impression in the First Circuit. And although courts in other circuits, as well as the District of Puerto Rico in Cachola, have addressed similar circumstances, none has squarely addressed whether a mandatory charge may constitute a tip where customers were not consistently permitted to provide an additional gratuity and received varying representations concerning the nature and purpose of the charge. The parties have not fully addressed whether, and to what extent, these issues bear relevance on the legal question before the Court. Because the Court has yet to rule on Defendants' motion for summary judgment, the parties are **ORDERED** to submit supplemental briefs addressing the relevance, if any, of these issues to assist the Court in adjudicating Defendants' request for summary judgment. Briefs are not to exceed twenty (20) pages and are due by **October 30, 2026**.

## IV. Conclusion

For the reasons discussed above, Plaintiffs' motion at Docket No. 222 is **GRANTED in part** and Defendants' request for decertification is **DENIED**. Plaintiffs' motion for partial summary judgment is **DENIED**.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 30th day of September, 2026.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge

---

[8] Defendants expressed that the service charge compensation system was meant to address disparity in compensation between servers and the rest of Bottles employees (DSAUF ¶ 15; PSUF ¶ 2.8) and that the change in compensation system was intended to "free management from restrictions imposed by federal law." PSUF ¶ 2.16.

[9] Defendants explained that the service charge was used to pay servers commission, chefs, dishwashers, front-end personnel, and attendance bonus (PSUF ¶ 2.13; Docket No. 214-2 at p. 9-10), for the payment of a sommelier (PSUF ¶ 7.1(a)), and for operating business expenses (DSAUF ¶ 46-47).